UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| SKY GROUP USA, LLC | ) |
| EFRAIN BETANCOURT, JR. | ) |
| | ) |
| Defendants, and | ) |
| | ) |
| ANGELICA BETANCOURT | ) |
| EEB CAPITAL GROUP, LLC | ) |
| | ) |
| Relief Defendants. | ) |
| _____ | ) |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Securities and Exchange Commission alleges as follows:

**I. INTRODUCTION**

1. The Commission brings this action as the result of a three-year-long securities offering fraud conducted by Defendants Sky Group USA, LLC and Efrain Betancourt Jr. that victimized hundreds of investors enticed by the Defendants' baseless promises of a high-return, low-risk investment. From no later than January 2016 through at least March 2020, Sky Group USA ("Sky Group" or "the Company"), a private South Florida firm, fraudulently raised more than $66 million from at least 505 investors, many of them members of the South Florida Venezuelan-American community, through the offer and sale of promissory notes ("Notes"). The Notes generally ranged in amount from $10,000 to $150,000 and paid interest running from 24 percent to as high as 120 percent.

2. Sky Group and Betancourt falsely represented to investors – many of whom heard

about the investment through word of mouth in the Venezuelan-American community – that Sky Group would use their money solely to make small-dollar, short-term loans to consumer borrowers with poor or no credit (so-called payday loans) and for costs associated with the loans. Betancourt also falsely represented to investors that Sky Group's business was profitable and that the promissory notes ("Notes") were safe and secured or guaranteed.

3. In reality, the proceeds Sky Group generated from its consumer loan business were woefully insufficient to cover principal and interest payments to investors. Sky Group and Betancourt used at least $19.2 million of investor funds to make Ponzi-like payments to other investors. In addition, Betancourt misappropriated at least $2.9 million for personal use, including a luxury chateau wedding in France and vacations to Disney World and the Caribbean, and authorized the transfer of at least $3.6 million to friends and relatives for no apparent legitimate business purpose.

4. The scheme unraveled in July 2019, when Betancourt told investors that Sky Group was suspending investor repayments on the Notes. Even then, Betancourt and Sky Group continued to lie, falsely blaming the suspension of repayments on a vendor responsible for processing the Company's investor repayments.

5. Through their conduct, Sky Group and Betancourt violated Sections 5(a) and (c) and Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and (c) and 77q(a), and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5. In addition, Betancourt violated Exchange Act Section 15(a)(1), 15 U.S.C. §78o(a)(1). The Commission seeks injunctive relief as well as disgorgement and civil penalties from both Defendants.

## II.  DEFENDANTS AND RELIEF DEFENDANTS

### A.  Defendants

6. **Sky Group** is a Florida limited liability company headquartered in Miami, Florida, formed in March 2015.  Sky Group is licensed with the State of Florida as a sales finance company and, for at least part of the period when it offered and sold securities, was licensed with the State of Utah as a deferred deposit lender.  Sky Group has never been registered with the Commission in any capacity.

7. **Betancourt**, 32, is a resident of Miami, Florida.  Betancourt is the Chief Executive Officer, managing member and sole owner of Sky Group.  As Chief Executive Officer, Betancourt managed all aspects of Sky Group's operations.  In addition he met with and solicited numerous potential Sky Group investors.  Betancourt has never been registered with the Commission in any capacity or associated with a registered entity.

### B.  Relief Defendants

8. **Angelica Betancourt**, 33, was married to Betancourt from January 2014 until September 2018.  Angelica Betancourt is a resident of Miami, Florida and was employed by Sky Group in an administrative capacity.  She received at least $1.2 million of Sky Group investor funds for no apparent legitimate business purpose.

9. **EEB Capital LLC** is a Florida limited liability company formed in February 2018.  Betancourt and his current wife are the signatories on two bank accounts in the name of EEB Capital, which received at least $1.5 million of Sky Group investor funds for no apparent legitimate business purpose.

## III.  JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), (e) and 78aa.

11. This Court has personal jurisdiction over the Defendants and Relief Defendants, and venue is proper in the Southern District of Florida, because Betancourt resides in the District and Sky Group and all of the Relief Defendants used addresses in this District and conducted their business in this District. In particular, Sky Group's operations were located in the Southern District, and Betancourt conducted, supervised and managed all aspects of Sky Group's fundraising and loan business at Sky Group's Miami headquarters.

12. The Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, and the mails, in connection with the conduct, practices and courses of business set forth in this Complaint.

## IV.  FACTS

### A.  The Offer and Sale of Promissory Notes

13. From no later than January 2016 through at least March 2020, Sky Group raised approximately $66 million from at least 505 (and as many as 685) investors through the offer and sale of the Notes. Many of the investors were members of the South Florida Venezuelan-American community, where news of the investment spread by word-of-mouth. In fact, Betancourt pitched the investment in Sky Group as a great opportunity for members of the Venezuelan immigrant community to generate investment income.

14. But the investment was not limited to Venezuelan-Americans or South Florida. Investors came from at least 18 U.S. states and territories and 19 additional countries. There was no requirement that Sky investors hail from any particular location or demonstrate any particular level of income, wealth, or investment sophistication. Many of the investors were not sophisticated

or wealthy and had limited investment experience.

15. Moreover, Sky Group hired a network of 52 outside sales agents responsible for initially contacting and making pitches to potential investors. The sales agents, who were not registered as brokers or associated with registered brokers or dealers, met with investors or talked to them over the phone, and stressed the monthly interest payments investors would earn as a key feature of the investment. They also stressed the purported safety of the Notes. The sales agents earned a commission of one percent of each dollar the investors they recruited invested in the Notes. The Company wound up paying approximately $9.8 million in commissions to the sales agents, most of which the Company did not disclose to investors and all of which Betancourt authorized.

16. Betancourt also met personally with numerous investors to close the deal, or spoke with them on the phone or by email. In meetings at Sky Group's offices, Betancourt described Sky Group's payday loan business and showed investors the company's website and a telemarketing office where company representatives purportedly solicited loan customers. He claimed Sky Group had a $70 million loan portfolio generated by the Notes, and that as a result the Company was profitable and had reserves to make interest payments on the Notes. Therefore, he claimed to numerous investors their investment would be safe. Betancourt also emphasized the monthly interest payments investors would receive as an important reason to invest, and claimed the investment was a great opportunity for Venezuelan immigrants to generate investment income.

17. Those who invested signed a "Loan Agreement and Promissory Note" with Sky Group in which investors agreed to provide Sky Group funds in return for monthly interest payments and the return of principal after one year. The principal amount of each Note generally ranged from $10,000 to $150,000, but went as high as $1.1 million. The annual interest rate was

normally 48 percent, but ranged from as low as 24 percent to as high as 120 percent. Investors purchased the Notes because of their purported safety and the high interest rates.

18. Sky Group stated in the Notes it would use investor proceeds solely to make consumer loans or for costs associated with those loans, but in reality used investor funds for a variety of other purposes. Of the approximately $66 million raised from investors, Sky Group, bank, and other financial records show the Company made only about $12.2 million of consumer loans (and received only $20.5 million in loan repayments), in direct contrast to Betancourt's claims of a $70 million loan portfolio and reserves sufficient to repay investors.

19. Sky Group also used almost $12 million in investor funds on operating expenses, another $9.8 million to pay sales agent commissions, and at least $19.2 million of later investor funds to repay earlier investors' principal and interest. And as described in further detail below, Betancourt was responsible for misappropriating at least $6.5 million in investor funds for personal and family use.

20. Sky Group investors did not provide funds directly to the Company's payday loan borrowers. Rather, as set forth above, they provided funds to Sky Group for use in its business operations. Sky Group only used approximately 20 percent of investor funds on payday loans; the Company used the rest on business operations, sales agent commissions, personal expenses, and investor repayments. Furthermore, although about 20 percent of the Notes purported to give investors a general security interest in Sky Group assets, they did not give investors an enforceable lien or security interest in any particular company assets or receivables. The Notes furthermore did not provide investors a secured interest in the payday loans or the loan receivables.

21. Sky Group pooled all investor funds together in its bank accounts, and once investors gave money to Sky Group, they lost all control over how Sky Group used their funds.

Investors were completely dependent on Sky Group to make successful payday loans to achieve their returns. Investors did not have any say in the payday loan portfolio, who Sky Group loaned money to, or Sky Group's collection efforts. The success of the investment therefore was inextricably tied to the success of Sky Group's payday loan business or other efforts by Betancourt and Sky Group to generate revenue. The investors provided the funds and received returns; Sky Group managed and controlled the business operations purportedly used to generate those returns.

### B.  Material Misrepresentations and Omissions

#### 1.  Sky Group's Use of Investor Funds

22. Betancourt and Sky Group repeatedly promised investors they would use funds on the payday loan business only. The Notes expressly stated that Sky Group:

> agree[d] that the funds to be received and governed by [the Notes] are to be used for the sole purpose of **portfolio financing** and associated cost by Sky Group USA LLC and any of its partner or affiliate corporations. The principal balance shall not be used for payment to members or any other expense that are not related to the portfolio financing of the corporation.

Emphasis in original. Betancourt repeated the false statements that Sky Group would only use investor funds on payday loans in his meetings with investors.

23. In reality, Sky Group and Betancourt did not use investor funds for the sole purpose of portfolio financing and associated costs. Of the approximately $66 million raised by Sky Group through the offer and sale of the Notes, Sky Group used only 20 percent on payday loans. As described above, it used the rest on, among other things, Company business operations, sales agent commissions, and at least $19.2 million to make Ponzi-like distributions to certain investors. In addition, Betancourt misappropriated investor funds for personal use and diverted funds to others.

24. Because Betancourt supervised all aspects of Sky Group's operations and controlled its bank accounts, he knew or was extremely reckless in not knowing that Sky Group

7

was using only a fraction of investor money to make payday loans, and therefore lying to investors about its use of funds.

### *2. Sky Group's Profitability and the Safety and Security of the Notes*

25. Betancourt represented to investors in meetings that Sky Group's payday loan business was profitable and expanding, claiming to one investor that Sky Group had a $70 million loan portfolio. In June 2019, Betancourt told at least one investor that Sky Group stood to profit by approximately $31 million from existing loans. Betancourt also represented to investors that their principal and interest payments were protected by the profits Sky Group generated from the high interest rates the Company charged borrowers.

26. Again, the truth was far different. The proceeds Sky Group generated from the loans were not sufficient to cover the principal and interest payments due to investors on the Notes. Sky Group made consumer loans totaling approximately $12.2 million and received approximately $20.5 million in payments from those loans, generating revenues of approximately $8.3 million. Over the same period, the Company owed investors $66 million in principal repayments alone. During the time the Company offered and sold the Notes, its payments to investors and sales agents far exceeded the proceeds that it received from consumer loans.

27. Furthermore, the statements of Betancourt and sales agents that the Notes were safe, and Betancourt and Sky Group's promises that the notes were secured or guaranteed, were false. Although about 20 percent of the Notes purported to give investors a general security interest in Sky Group assets, they did not give investors an enforceable lien or security interest in any particular company assets or receivables. The Notes furthermore did not provide investors a secured interest in the payday loans or the loan receivables. There was nothing safe or guaranteed about the Notes.

28.     During the summer of 2019, Sky Group and Betancourt's scheme began to unravel. On June 18, 2019, Sky Group entered into a consent order with the State of Washington Department of Financial Institutions resulting from Sky Group's failure to obtain the license required to transact payday loans in the State of Washington. Sky Group and Betancourt did not disclose the consent order to investors.

29.     Separately, by no later than July 2019, due to its deteriorating financial condition, Sky Group began to default on its principal and interest payments to investors. To perpetuate his scheme, Betancourt sent a letter to investors on July 30, 2019 stating that Sky Group was forced to suspend all payments to investors due to an administrative issue with one of its payment processors. However, this was false as there was no problem with the payment processor.

30.     Despite the Company's default and other problems, Sky Group and Betancourt continued to solicit funds from investors, raising approximately $4.6 million (of the $66 million total) in Notes from existing and new investors between August 1, 2019 and March 1, 2020. As with earlier investors, Betancourt and Sky Group falsely represented to this group that the Company would use their funds solely on payday loans and related costs.

### C. Misappropriation of Investor Funds

31.     While promising investors that Sky Group would use investor funds only for payday loans and associated costs, Betancourt misappropriated at least $2.9 million of investor funds for personal use. Approximately half of this money went to pay Betancourt's personal credit card bills, and he used another $466,000 to fund a trust of which he is the beneficiary.

32.     Investor funds were also diverted from a number of Sky Group related accounts for additional apparent personal expenses of Betancourt. This included several hundred thousand dollars for Betancourt's wedding at an exclusive chateau located on the French Riviera in southern

France, and additional amounts for real estate costs associated with the purchase of a $1.5 million luxury condominium in downtown Miami, vacations to Disney Resorts and the Caribbean, and service on his personal Piper airplane.

33. In addition, Betancourt transferred approximately $3.6 million in investor funds to friends and relatives for no apparent legitimate business purpose. The recipients of these funds included Betancourt's ex-wife Angelica Betancourt, who had signatory authority over accounts that received $1.2 million in investor funds. Another approximately $1.5 million went to Relief Defendant EEB Capital Group, LLC, an entity whose bank accounts Betancourt and his current wife controlled.

## V. CLAIMS FOR RELIEF

## COUNT I

### Violations Of Sections 5(a) And 5(c) Of The Securities Act

34. The Commission repeats and realleges Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

35. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued by Sky Group as described in this Complaint, and no exemption from registration existed with respect to those securities.

36. From no later than January 2016 through at least March 2020, Sky Group and Betancourt, directly and indirectly:

a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

b) carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use of medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

37. By reason of the foregoing Sky Group and Betancourt violated, and unless enjoined are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Violations Of Section 17(a)(1) Of The Securities Act

38. The Commission repeats and realleges Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

39. From no later than January 2016 through at least March 2020, Sky Group and Betancourt, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes, or artifices to defraud.

40. By reason of the foregoing, Sky Group and Betancourt violated, and unless enjoined are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Violations Of Section 17(a)(2) Of The Securities Act

41. The Commission repeats and realleges Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

42. From no later than January 2016 through at least March 2020, Sky Group and

Betancourt, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

43. By reason of the foregoing, Sky Group and Betancourt violated, and unless enjoined are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT IV

### Violations Of Section 17(a)(3) Of The Securities Act

44. The Commission repeats and realleges Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

45. From no later than January 2016 through at least March 2020, Sky Group and Betancourt, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, or courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

46. By reason of the foregoing, Sky Group and Betancourt violated, and unless enjoined are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT V

### Violations Of Section 10(b) and Rule 10b-5(a) Of The Exchange Act

47. The Commission repeats and realleges Paragraphs 1 through 33 of this Complaint

as if fully set forth herein.

48. From no later than January 2016 through at least March 2020, Sky Group and Betancourt, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of any security.

49. By reason of the foregoing, Sky Group and Betancourt violated, and unless enjoined are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT VI

### Violations Of Section 10(b) and Rule 10b-5(b) Of The Exchange Act

50. The Commission repeats and realleges Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

51. From no later than January 2016 through at least March 2020, Sky Group and Betancourt, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in connection with the purchase or sale of any security.

52. By reason of the foregoing, Sky Group and Betancourt violated, and unless enjoined are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT VII

### Violations Of Section 10(b) And Rule 10b-5(c) Of The Exchange Act

53. The Commission repeats and realleges Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

54. From no later than January 2016 through at least March 2020, Sky Group and Betancourt, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating or will operate as a fraud upon any person in connection with the purchase or sale of any security.

55. By reason of the foregoing Sky Group and Betancourt violated, and unless enjoined are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## COUNT VIII

## Violations Of Section 15(a) The Exchange Act

## (Against Betancourt Only)

56. The Commission repeats and realleges Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

57. From no later than January 2016 through at least March 2020, Betancourt, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer or when he was not associated with an entity registered with the Commission as a broker or dealer.

58. By reason of the foregoing, Betancourt directly or indirectly violated, and unless enjoined is reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## COUNT IX

### Unjust Enrichment

### (Against Relief Defendants Angela Betancourt And EEB Capital Group)

59. The Commission repeats and realleges Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

60. Angela Betancourt and EEB Capital Group received investor funds or property derived from those funds, to which they lack a legitimate claim.

61. Angela Betancourt and EEB Capital Group obtained these funds and property as part of the securities law violations alleged above, under circumstances in which it is not just or equitable for them to retain the funds.

62. By reason of the foregoing, Angela Betancourt and EEB Capital Group have been unjustly enriched and must disgorge their ill-gotten gains.

## VI.  RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find that Sky Group and Betancourt committed the violations alleged and:

### A.  Permanent Injunctive Relief

Issue Permanent Injunctions restraining and enjoining: (1) Sky Group and Betancourt from violating Sections 5(a), 5(c) and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and (2) Betancourt from violating Section 15(a)(1) of the Exchange Act.

### B.  Disgorgement and Prejudgment Interest

Issue an Order directing Sky Group, Betancourt and all of the Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct

alleged in this Complaint.

### C. Civil Penalties

Issue an Order directing Sky Group and Betancourt to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

### D. Officer and Director Bar

Issue an Order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), barring Betancourt from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file report pursuant to Section 15(d) of the Exchange Act.

### E. Further Relief

Grant such other relief as may be necessary and appropriate.

### F. Retention of Jurisdiction

Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

### VII. JURY TRIAL DEMAND

The Commission demands a trial by jury on any and all issues in this action so triable.

Dated: September 27, 2021                                  Respectfully submitted,

                                                                                  Robert K. Levenson, Esq.
Senior Trial Counsel
Florida Bar No. 0089771
Direct Dial: (305) 982-6341
Email: levensonr@sec.gov

Andrew O. Schiff
Regional Trial Counsel

S.D. Fla. No. A5501900
Telephone: (305) 982-6390
E-mail: schiffa@sec.gov

Alexander H. Charap, Esq.
Counsel
SDFL Special Bar No. A5502711
Direct Dial: (305) 416-6228
Email: charapal@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131