UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-23443-BLOOM/Otazo-Reyes

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

SKY GROUP USA LLC;
EFRAIN BETANCOURT, JR.;

        Defendants, and

ANGELICA BETANCOURT;
AND EEB CAPITAL GROUP, LLC,

        Relief Defendants.
_____/

## ORDER ON MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendants Sky Group USA, LLC ("Sky Group")

and Efrain Betancourt, Jr.'s ("Betancourt") (collectively, "Defendants") Motion to Dismiss

Complaint, ECF No. [23] ("Motion"). Plaintiff Securities and Exchange Commission ("Plaintiff"

or "SEC") filed a Response in Opposition, ECF No. [28] ("Response"), to which Defendants filed

a Reply, ECF No. [33] ("Reply"). The Court has carefully reviewed the Motion, the record in this

case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion

is denied.

**I.     BACKGROUND**

      The SEC initiated this action on September 27, 2021 against Defendants for violations of

the Securities Act and Exchange Act ("Securities Acts"). *See* ECF No. [1]. According to the SEC's

Complaint, Betancourt is the Chief Executive Officer, managing member, and sole owner of Sky

Group. *See id.* ¶ 7. The SEC alleges that, from January 2016 to March 2020, Defendants

fraudulently raised more than $66 million from at least 505 investors by promising to use the investments to finance Sky Group's business of offering short-term "payday" loans to consumer borrowers. *Id.* at ¶¶ 1-2. The investors signed an instrument called a "Loan Agreement and Promissory Note" ("Note") in which the investors agreed to provide Sky Group funds in return for interest payments each month and the principal after one year. *Id.* ¶ 17. Defendants used significant portions of investor funds for purposes other than financing payday loans. *Id.* at ¶¶ 18-19. Specifically, Defendants used the funds for business operations, sales agent commissions, personal expenses for Betancourt, and Ponzi-like repayments to earlier investors. *Id.* at ¶¶ 19-20. Defendants only used approximately twenty (20) percent of the funds for payday loans. *Id.* ¶ 20.

On December 10, 2021, Defendants filed the instant Motion to Dismiss pursuant to Rule 12(b)(1). *See* ECF No. [23]. Defendants contend that the Court lacks subject matter jurisdiction because the Notes bear a "family resemblance" to instruments that the Supreme Court has exempted from the Securities Acts. *See id.* at 4-5 (citing *Reves v. Ernst & Young,* 494 U.S. 56 (1990)). On December 23, 2021, the SEC filed its Response, arguing that the Court has subject matter jurisdiction because the Notes do not bear a "family resemblance" to the exempted instruments. *See generally* ECF No. [28]. SEC further argues that the Court has subject matter jurisdiction under the *Howey* test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). *See id* at 16-17. On January 7, 2022, Defendants' Reply followed. *See generally* ECF No. [33].

## II.   LEGAL STANDARD

A Rule 12(b)(1) motion challenges the district court's subject matter jurisdiction and takes one of two forms: a "facial attack" or a "factual attack." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). "A 'facial attack' on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of

subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *McElmurray*, 501 F.3d at 1251 (quoting *Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir. 1990)). "A 'factual attack,' on the other hand, challenges the existence of subject matter jurisdiction based on matters outside the pleadings." *Kuhlman v. United States*, 822 F. Supp. 2d 1255, 1256-57 (M.D. Fla. 2011) (citing *Lawrence,* 919 F.2d at 1529); *see Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) ("By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony.").

Therefore, "[i]n assessing the propriety of a motion for dismissal under Fed. R. Civ. P. 12(b)(1), a district court is not limited to an inquiry into undisputed facts; it may hear conflicting evidence and decide for itself the factual issues that determine jurisdiction." *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991). Further, "[w]hen a defendant properly challenges subject matter jurisdiction under Rule 12(b)(1), the district court is free to independently weigh facts, and 'may proceed as it never could under Rule 12(b)(6) or Fed. R. Civ. P. 56.'" *Turcios v. Delicias Hispanas Corp.,* 275 F. App'x 879, 880 (11th Cir. 2008) (quoting *Morrison v. Amway Corp.,* 323 F.3d 920, 925 (11th Cir. 2003)). "In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional issue." *Morrison*, 323 F.3d at 925 (quoting *Lawrence*, 919 F.2d at 1529).

However, a court may independently weigh facts and find that it lacks subject matter jurisdiction only "if the facts necessary to sustain jurisdiction *do not implicate the merits of plaintiff's cause of action.*" *Morrison*, 323 F.3d at 925 (citation omitted) (emphasis in original). When a jurisdictional challenge implicates the merits of plaintiff's claim, the court must "find that

jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* (citations omitted). According to the Eleventh Circuit, this ensures "a greater level of protection for the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . . both of which place great restrictions on the district court's discretion." *Id.* (citations omitted) (alterations in original); *see also SEC v. LeCroy*, No. 2:09-CV-2238-AKK, 2010 WL 11565305, at *2 (N.D. Ala. Aug. 4, 2010).

## III.     DISCUSSION

### a.   Standard for Evaluating Subject Matter Jurisdiction

The Court must first determine the standard of review for the instant Motion. *See* ECF No. [23] at 2. Defendants argue that the Court should consider matters outside the pleadings and that no presumptive "truthfulness" attaches to the SEC's factual allegations. *Id.* at 2-3 (quoting *Lawrence*, 919 F.2d at 1529). The SEC claims that Defendants are making a factual, rather than a facial, challenge to the Court's subject matter jurisdiction, and the SEC may therefore introduce additional facts. *See* ECF No. [28] at 2. The SEC further argues that factual disputes should be resolved in favor of the SEC as they would be under a summary judgment motion. *See id.* Defendants reply that the SEC's argument is mistaken because although Defendants make a factual challenge – thus allowing the Court to consider extrinsic evidence – the Court should not resolve factual disputes in the SEC's favor. *See* ECF No. [33] at 2-3. According to the Reply, "Defendants have not challenged the merits of the Commission's claims in their Motion, but have challenged 'the trial court's jurisdiction—its very power to hear the case.'" ECF No. [33] at 3 (quoting *Morrison*, 323 F.3d at 925). Because Defendants do not challenge the merits of the SEC's claims, Defendants contend that the Court should not resolve factual disputes in the SEC's favor. *See id.*

As an initial matter, the Court agrees with both Parties that Defendants raise a factual challenge to subject matter jurisdiction. As a result, the Court can consider extrinsic evidence in addressing the Motion. *See Kuhlman*, 822 F. Supp. 2d at 1256-57 (citing *Lawrence,* 919 F.2d at 1529); *Stalley*, 524 F.3d 1229, 1233 (11th Cir. 2008). The Court must next address whether factual disputes should be resolved in the SEC's favor as the SEC argues or if the SEC's factual allegations should be not entitled to a presumption of truthfulness, as Defendants argue.

As stated above, a court may independently weigh facts and find that it lacks subject matter jurisdiction only "if the facts necessary to sustain jurisdiction *do not implicate the merits of plaintiff's cause of action.*" *Morrison*, 323 F.3d at 925 (citation omitted) (emphasis in original). When a jurisdictional challenge implicates the merits of the plaintiff's claim, the court must "find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* (citations omitted). According to the Eleventh Circuit, "jurisdiction becomes intertwined with the merits of a cause of action when a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Morrison*, 323 F.3d 920, 926 (11th Cir. 2003) (internal quotation marks and citation omitted). In regard to a jurisdictional challenge based on the word "security" under the Securities Acts, the Fifth Circuit in a pre-*Bonner* decision "specifically held that the definition of the term 'security' in the context of a suit based on the federal securities laws may reach the merits of the case." *LeCroy*, 2010 WL 11565305, at *4 (citing *Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. May 20, 1981)).[1] In *Williamson* the Fifth Circuit held that "it is clear that the jurisdictional issue reaches the merits of the plaintiffs' case; if the [notes at issue] are not securities, there is not only no federal jurisdiction to hear the case but also no federal cause of action on the stated facts." 645 F.2d at 416.

---

[1] Pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

In this case, Defendants' argument rests on their contention that the SEC lacks the authority to prosecute them under the Securities Acts because the Notes are not securities. *See* ECF No. [23] at 4. This argument reaches the merits of the SEC's case because, as in *Morrison*, "if the [Notes] are not securities, there is not only no federal jurisdiction to hear the case but also no federal cause of action on the stated facts." *Williamson*, 645 F.2d at 416. Therefore, the Motion should be analyzed as a Rule 12(b)(6) or Rule 56 challenge. *See Morrison*, 323 F.3d at 925. Either way, the Court must view factual disputes in the light most favorable to the non-movant, namely the SEC. *See LeCroy*, 2010 WL 11565305, at \*4. As such, the Court relies on extrinsic evidence presented by both Parties, views the factual allegations in the light most favorable to the SEC, and draws all reasonable inferences in favor of the SEC. *See Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019).[2]

### b. Status of the Notes

The Court next addresses whether the Notes are securities under the Securities Acts. Defendants argue that the Notes bear a "family resemblance" to the categories of notes that are not securities. *See* ECF No. [23] at 4. The SEC counters that the Notes do not fall within the categories

---

[2] The Court concludes this subsection by noting that in all four of the cases cited by Defendants on this issue, the courts addressed the defendants' Rule 12(b)(1) challenge by drawing factual allegations and possible inferences in favor of the plaintiffs, undermining Defendants' argument that this Court should give the SEC's allegations no presumption of truthfulness. *See Meridian Software Funding, Inc. v. Pansophic Sys., Inc.*, No. 91 C 6055, 1992 WL 107310, at \*2 (N.D. Ill. May 14, 1992) ("When dealing with a motion to dismiss, the court assumes the truth of all well-pled factual allegations and make all possible inferences in favor of the plaintiff."); *Tannebaum v. Clark*, No. 88 C 7312, 1991 WL 39671, at \*1 (N.D. Ill. Mar. 18, 1991) ("As in all motions to dismiss, the allegations of the complaint are taken as true along with all reasonable inferences therefrom in the light most favorable to the plaintiff."); *Roer v. Oxbridge Inc.*, 198 F. Supp. 2d 212, 221 (E.D.N.Y. 2001) ("A district court should grant a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. . . . It is within this framework that the Court addresses the present [12(b)(1) and 12(b)(6)] motion."); *BRS Assocs., L.P. v. Dansker*, 246 B.R. 755, 764 (S.D.N.Y. 2000) (appearing to apply the Rule 12(b)(6) standard to address the Rule 12(b)(1) motion).

of notes that are not securities and do not bear a "family resemblance" to the exempted notes. *See*

ECF No. [28] at 8-14.

In *Reves,* the Supreme Court set forth the proper approach to ascertain whether a note is a

security under the Securities Acts. 494 U.S. 56, 64-65 (1990). The Supreme Court adopted the

"family resemblance" test, under which:

> [a] note is presumed to be a 'security,' and that presumption may be rebutted only
> by a showing that the note bears a strong resemblance (in terms of the four factors
> we have identified) to one of the enumerated categories of instrument[s] [identified
> by the Second Circuit in the case of *Exchange Nat'l Bank of Chicago v. Touche
> Ross & Co.,* 544 F.2d 1126, 1137 (2d Cir. 1976)].

*Reves*, 494 U.S. at 67. The categories of instruments enumerated by the Second Circuit which are

*not* securities include:

> the note delivered in consumer financing, the note secured by a mortgage on a
> home, the short-term note secured by a lien on a small business or some of its assets,
> the note evidencing a 'character' loan to a bank customer, short-term notes secured
> by an assignment of accounts receivable, or a note which simply formalizes an
> open-account debt incurred in the ordinary course of business (particularly if, as in
> the case of the customer of a broker, it is collateralized)[, and] . . . notes evidencing
> loans by commercial banks for current operations.

*Id.* at 65 (quoting *Exch. Nat. Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir.

1976) and *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2d Cir. 1984)).

The Supreme Court has set forth four factors to determine whether an instrument bears a

strong resemblance to the notes on the list: (1) the motivation that would prompt a reasonable seller

and buyer to enter into the transaction; (2) the distribution plan of the instrument; (3) the reasonable

expectations of the investing public; and (4) the existence of another regulatory scheme that

significantly reduces the risk of the instrument. *Reves*, 494 U.S. at 66-67. The Supreme Court

instructed that if the application of *Reves*' four factors "leads to the conclusion that an instrument

is not sufficiently similar to an item on the list," the analyzing court must then decide "whether

another category should be added . . . by examining the same factors." *Id.* at 67. The Court in *Reves* conceived of this analysis as comprised of two separate steps, but "both inquiries involve the application of the same four-factor test, and so the two essentially collapse into a single inquiry." *SEC v. Wallenbrock*, 313 F.3d 532, 537 (9th Cir. 2002).

As a preliminary matter, neither Party meaningfully disputes that the Notes do not fall within the expressly enumerated categories of exempted notes. *See* ECF No. [28] at 9. The material issue is whether the Notes have a "family resemblance" to any of the notes that are not securities. Therefore, the Court proceeds to apply the four-factor test.

### i. *Motivations of the Sellers and Buyers*

The Court first examines the motivations of the Defendants and the investors. *Reves,* 494 U.S. at 66. "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Id.* On the other hand, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, . . . the note is less sensibly described as a 'security.'" *Id.*

Here, Defendants concede that "each lender was likely motivated by interest that the [] Notes would generate." ECF No. [23] at 6. Therefore, the remaining question is whether Defendants' purpose was to raise money for the general use of a business enterprise. Defendants argue, based on the express terms of the Notes, that their primary purpose for selling the Notes was not for Sky Group's general use but for "portfolio financing and associated cost[s]" or financing "payday loans." *Id.* at 6 (citing ECF No. [23-1] at 4), 6, n.3 (citing ECF No. [1] ¶¶ 2, 16, 20-25, 27-28, 30-31). The SEC argues that Defendants' motivation for selling the Notes was to

raise money for general use. *See* ECF No. [28] at 11. In support of its argument, the SEC claims that the unrebutted allegations – that Defendants pooled the investments, spent the funds as they saw fit, and used only twenty (20) percent of the funds for payday loans – establish Defendants' intent to use the funds for general use irrespective of the terms of the Notes. *See id*.

The Court agrees with the SEC. Although Defendants may have persuaded the investors to invest by promising to use the funds for the specific purpose of financing payday loans, the SEC adequately alleges that Defendants used the funds for general use and spent only a small portion of the funds to finance payday loans. *See* ECF No. [1] ¶ 20. The Court is bound to look beyond the terms of the Notes and consider the economic realities of the transactions. *See SEC v. Complete Bus. Sols. Grp., Inc*., 538 F. Supp. 3d 1309, 1323 (S.D. Fla. 2021) ("*Reves* emphasizes that the [family resemblance] test is designed to focus on the economic realities of the transaction and not elevate form over substance." (quoting *Reves*, 494 U.S. at 61-62) (internal quotation marks omitted)). As such, considering the economic realities of the transactions, viewing the facts in the light most favorable to the SEC, and drawing all reasonable inferences in favor of the SEC, it is evident that Defendants were motivated to raise money for general use, not solely for payday loans.

Further, as the SEC correctly notes, the two cases that Defendants cite do not advance Defendants' argument on this matter. *See* ECF No. [28] at 12, n.3. In *Holloway v. Peat Marwick Mitchell & Co*., 900 F.2d 1485, 1488, n.1 (10th Cir. 1990), the court held that the use of proceeds to buy specific assets or services, rather than general financing, indicated that the note was not for general use. In this case, however, the investments were used for general financing as noted above. In *Eagle Trim, Inc. v. Eagle-Picher Indus. Inc.,* 205 F. Supp. 2d 746, 751 (E.D. Mich. 2002), the court determined that a mortgage note executed to finance a specific asset was not a security. The

instant case does not involve a mortgage note, and the investments were not used to finance a specific asset. Thus, the first factor weighs in favor of the Notes being securities.

### ii. Distribution Plan

The second factor requires that the Court consider whether there was "common trading for speculation or investment." *Reves,* 494 U.S. at 66. The offer and sale of the Notes to a "broad segment of the public" are sufficient to establish this factor. *Id.* at 68. "Importantly, an 'evident interest in widening the scope of distribution,' combined with the 'broad availability of the notes' can tip this factor 'strongly in favor' of classifying the note as a security." *SEC v. Thompson*, 732 F.3d 1151, 1164 (10th Cir. 2013) (quoting *Wallenbrock,* 313 F.3d at 539).

Defendants argue that the second *Reves* factor weighs in their favor because the Notes were not assignable and there was no secondary market for the Notes. *See* ECF No. [23] at 7. The SEC concedes that although some courts consider the existence of a secondary market, *see* ECF No. [28] at 13, n.4, the Court should look to the large number of investors, *see id.* at 12-13. The SEC cites several cases in which courts have examined the number of investors and the wide availability of notes. *See id.* at 12-13 (citing *Wright v. Downs*, 972 F.2d 350, 1992 WL 168104 at *3 (6th Cir. July 17, 1992) (holding that notes sold to 200 investors constituted a broad segment); *Thompson*, 732 F.3d at 1165 (noting that seller "sought to expand its distribution to anyone interested who had $100,000 to invest . . . and made its instruments available to anyone willing to pay"); *SEC v. Levin*, Case No. 12-cv-21917, 2014 WL 11878357 at *10 (S.D. Fla. Oct. 6, 2014) ("that the notes were sold to a number of investors in different states indicates that the notes are securities")).

The Court agrees with the SEC. The Complaint alleges that Defendants sold the Notes to at least 505 investors from 18 U.S. states and 19 different countries. *See* ECF No. [1] ¶¶ 1, 14. The total amount invested exceeded $66 million. *See id.* ¶ 1. Sky Group hired a network of external

sales agents to solicit investments. *See id.* ¶ 15. Further, the Complaint alleges that although many of the investors were Venezuelan-Americans, "the investment was not limited to Venezuelan-Americans or South Florida." *Id.* ¶ 14. According to the Complaint, "[t]here was no requirement that Sky investors hail from any particular location or demonstrate any particular level of income, wealth, or investment sophistication." *Id.* Plainly, the Notes were offered and sold to a broad segment of the public. *See, e.g.*, *SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1128 (9th Cir. 1991) (notes sold to 148 investors in several states were offered to a broad segment of the public); *Wallenbrock*, 313 F.3d at 539 (notes held by over 1,000 investors in at least 25 states constituted broad availability); *Wright*, 972 F.2d at 1992; *Levin*, No2014 WL 11878357, at *10. As such, the SEC's allegations establish that there was "common trading for speculation or investment."[3]

In addition, the inability to assign the Notes and the consequent lack of a secondary market are not dispositive for the Court's analysis on the second *Reves* factor. One case cited by Defendants affirmed a lower court's decision that the lack of a secondary market should not be dispositive. *See* ECF No. [23] at 7. "The absence of a secondary market for these instruments is not significant since secondary markets do not exist for certain known securities, such as

---

[3] Given the weight of authority cited above, the Court is not persuaded by Defendants' argument that the number of buyers is not a significant factor. Defendants rely on *SEC v. Global Telecom Services, LLC*, 325 F. Supp. 2d 94 (D. Conn. 2004), and *Glazer v. Abercrombie & Kent, Inc*., No. 07 C 2284, 2009 WL 3060269, *8 (N.D. Ill. Sept. 22, 2009), for their unavailing contention. *See* ECF No. [23] at 7. Although the court in *Global Telecom Services* determined that the lack of broad sales was not a "dispositive" factor, the court did not state that broad sales could not be a significant factor. 325 F. Supp. 2d at 114. As noted above, the large number of investors is a significant factor in this case, and the number of investors combined with a distribution plan that made the Notes available to the general public weighs against Defendants' argument. Further, in *Glazer*, 2009 WL 3060269, the court determined that notes that were available to less than 400 investors with at least $400,000 to invest were not broadly available to the public. *See Glazer*, 2009 WL 3060269, at *8. Contrary to Defendants' representation of the case, the court in *Glazer* did not affirmatively state that the number of buyers was not significant. *See id.* Moreover, this case involves more than 505 investors and a wider distribution plan that apparently included anyone who had at least $10,000 to invest. *See* ECF No. [1] ¶ 1.

commercial paper." *Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 763 F. Supp. 36, 43 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992). Thus, irrespective of the lack of a secondary market, given the widespread offer and sale of the Notes, the second *Reves* factor weighs in favor of the Notes being securities.

### iii.   *Reasonable Expectations of the Investing Public*

Under the third factor, the Court must "examine the reasonable expectations of the investing public." *Reves,* 494 U.S. at 66. The Court must consider "instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Id*. Where the notes are characterized by the seller as "investments" and there are no "countervailing factors" that would lead a reasonable person to question this characterization, "it would be reasonable for a prospective purchaser to take the [seller] at its word." *Id.* at 69.

Defendants argue that the investing public would not have expected the Notes to be investments because the Notes were never traded, did not contain any language suggesting that investors would be entitled to profits over the interest payments specified on the Notes, and referred to the buyer and seller as the "Lender" and "Borrower" suggesting that the Notes were loans. *See* ECF No. [23] at 8-9. Further, the Notes included acceleration clauses and collection costs clauses. *See id.* at 9. The SEC argues that a reasonable investor would have expected the Notes to be investments because the Defendants promised high interest payments and promoted the investment as a great way to generate income. *See* ECF No. [28] at 13.

The Court agrees with the SEC. According to the Complaint, Betancourt "pitched" the Notes as a "great opportunity for members of the Venezuelan immigrant community to generate investment income." ECF No. [1] ¶ 13. Further, the Complaint alleges that Betancourt represented

to investors that their investments were protected by the profits Sky Group generated from the high interest rates charged to Sky Group's payday loan borrowers. *See id.* ¶ 25. Betancourt told investors that the Notes were "safe and secured or guaranteed." *See id.* ¶ 2. Based on these representations, the investing public could reasonably view the Notes as investments. *See SEC v. 1 Glob. Cap. LLC*, No. 18-CV-61991, 2019 WL 1670799, at *6 (S.D. Fla. Feb. 8, 2019) (determining that the investing public could reasonably believe the notes in question were investments because there were advertised as being "safe"); *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1336 (S.D. Fla. 2018) (determining that the notes were securities because of the advertised five (5) to eight (8) percent annual return, paid on a monthly basis, and representations that the offerings were low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers); *Levin*, 2014 WL 11878357, at *10 (determining that the notes were securities because they were advertised as a "low risk investment strategy" and investors were promised a high interest rate).

While Defendants argue that the Notes themselves contain language suggesting that the Notes are a loan as opposed to an investment, the Court is not persuaded. As noted above, the Supreme Court in *Reves* emphasized that the "family resemblance" test is designed to focus on the "economic realities" of the transaction and not to elevate form over substance. *Reves*, 494 U.S. at 61-62. The manner in which Defendants marketed the Notes to the broader public as a safe opportunity to generate investment income would lead the investing public to reasonably believe that the Notes were investments, not loans.

To the extent that Defendants cite *Eagle Trim,* 205 F. Supp. 2d 746, for the proposition that *Reves* determined that a "note" with high interest payments cannot be an investment similar to a stock, *see* ECF No. [33] at 6, the Court is not persuaded. The note in question in *Eagle Trim* was

a single mortgage note used in a "standard borrower/lender commercial setting," which is materially different from the hundreds of Notes at issue in this case. 205 F. Supp. 2d at 751. Further, in *Eagle Trim*, the court quoted *Reves*, by stating "[w]hile common stock is the quintessence of a security, and investors therefore justifiably assume that a sale of stock is covered by the Securities Acts, the same simply cannot be said of notes, which are used in a variety of settings, *not all of which involve investments*." *Id.* at 752 (quoting *Reves*, 494 U.S. at 62) (emphasis added). Therefore, while some notes are not securities, such as the mortgage note in *Eagle Trim*, the Supreme Court held that some notes can be securities if they involve investments. This is precisely the case where the Notes can be securities based on Defendants' marketing of the Notes as investments. Thus, the third factor weighs in favor of the Notes being securities.

### iv.  *Existence of Another Regulatory Scheme*

Under the final *Reves* factor, the Court considers whether "some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves,* 494 U.S. at 67. If the note "would escape federal regulation entirely if the Acts were held not to apply," the fourth factor supports characterizing the instrument as a security. *See id.* at 69 (recognizing as adequate risk-reducing factors (1) insurance provided by the Federal Deposit Insurance Corporation (FDIC), and (2) comprehensive regulation under the Employee Retirement Income Security Act (ERISA), because both ensure that an instrument would not "escape federal regulation entirely if the [Securities] Acts were held not to apply").

Defendants do not argue that there is another regulatory scheme for the Notes, but claim that the Notes had "guaranty provisions, non-waiver and non-assignment clauses, loan acceleration clauses, a late fee provision, security provisions, and a plethora of other risk mitigation and lender

protection provisions," which weigh against a determination that the Notes are securities. ECF No. [23] at 10. Defendants also argue that the Notes were negotiated, meaning the main concern underlying the Securities Acts – that the issuer has superior information and investors must rely on inferior market information – is not present in this case. *See id.* (citing *Asset Prot. Plans, Inc. v. Oppenheimer & Co., Inc*., No. 8:11-cv-440-T-23MAP, 2011 WL 2533839, at *4 (M.D. Fla. Jun. 27, 2011)).

The SEC argues that most of the Notes had no secured interest. *See* ECF No. [28] at 14. The minority of Notes that were purportedly secured by collateral were not secured by any specific collateral. *See* ECF No. [1] ¶ 20. Therefore, the SEC argues that there was no meaningful collateralization to protect the investors. *See* ECF No. [28] at 14.

The Court is persuaded by the SEC's argument. First, Defendants fail to identify a regulatory scheme that could have reduced the risks associated with the Notes. Second, Defendants fail to identify meaningful risk-reducing factors. Collateralization could have helped reduce the risks. But here, as described above, only a portion of the funds tendered under the Notes were purportedly secured. *See* ECF No. [1] ¶ 20. And the security interest in those Notes did not give investors an enforceable lien or security in any particular Sky Group asset, Sky Group receivables, payday loans, or loan receivables. *See id*. In other words, the collateralization appears to be a fiction. *See Wallenbrock*, 313 F.3d 532, 539 (holding that the notes were securities because "the so-called collateralization appears to be a fiction"). To the extent that Defendants argue that other contractual provisions protect the investors, the Court is not persuaded. The Supreme Court stated that the risk-reducing "scheme [must] *significantly* reduce[] the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves,* 494 U.S. at 67 (emphasis added). Given the illusory nature of the collateralization, the other contractual provisions – assuming they

15

are not similarly illusory – do not constitute a scheme that significantly reduces the risk of the Notes such that the Securities Acts are unnecessary.

Further, although the SEC does not address Defendants' argument that the Notes were negotiated, Defendants' argument that negotiation negates the need for the Securities Acts in this case is unavailing. Defendants rely on the fact that the Notes each had different interest rates to argue that the Notes were negotiated, and that, as a result, the Securities Acts are not necessary to mitigate the information disparity that ordinarily exists between the seller and the buyer. *See* ECF No. [23] at 10. However, Defendants' argument requires the Court to make two unsubstantiated inferential leaps. First, Defendants fail to explain in sufficient detail that the different interest rates are, in fact, the result of negotiations rather than Defendants simply offering different interest rates depending on any number of factors such as differing market conditions, different types of investors, and different investment amounts. Defendants effectively ask that the Court infer based on the differing interest rates that all Notes were negotiated. Second, even if the Court were to presume that the interest rates were negotiated, Defendants fail to explain how the negotiations supposedly cured the information disparity that exists between Sky Group and the investors to the extent that the Securities Acts are not necessary. The Complaint notably states that "[m]any of the investors were not sophisticated or wealthy and had limited investment experience." ECF No. [1] ¶ 14. The Court declines to make such inferential leaps in this case. Thus, the final factor weighs in favor of the Notes being securities.

The Court concludes that the Notes do not bear a family resemblance to the exempted notes because each of the factors weighs toward that conclusion. For the same reason, the Court declines to add an additional category to the list of exempted notes. Therefore, the Notes are securities and

subject to federal securities regulation. The Court need not address the SEC's arguments in the alternative.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   Defendants' Motion to Dismiss, **ECF No. [23]**, is **DENIED**.

2.   Defendants shall answer the SEC's Complaint by no later than **February 14, 2022**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on February 1, 2022.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record